Filed 10/10/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| NEW COMMUNE DTLA LLC et al., <br><br> Petitioners and Appellants, <br><br> v. <br><br> CITY OF REDONDO BEACH et al., <br><br> Defendants and Respondents. | B336042 <br><br> Los Angeles County <br> Super. Ct. No. 22TRCP00203 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ronald F. Frank, Judge. Reversed and remanded with directions.

Rutan & Tucker, Douglas J. Dennington, Peter J. Howell, and Erik Leggio for Petitioners and Appellants.

Office of the City Attorney, Michael W. Webb; Richards, Watson & Gershon, Lisa Bond, and Ginetta L. Giovinco for Defendants and Respondents.

Patterson & O'Neill, Ryan J. Patterson, Brian O'Neill, and Ephraim S. Margolin as Amicus Curiae on behalf of Petitioners and Appellants.

For decades, California has recognized that housing opportunities are not equally available to Californians of all economic levels. It has endeavored to address this problem by enacting a series of laws aimed at promoting development that will meet "the housing needs of all economic segments of the community." (Gov. Code, § 65580, subd. (d).)[1] At issue here is The Housing Element Law.[2] It requires local jurisdictions to periodically review and adopt a state-approved "housing element" that explains how they will accommodate their fair share of regionally needed housing.

New Commune DTLA LLC and Leonid Pustilnikov[3] are developers. New Commune appeals from a denial of its petition for writ of mandate challenging the City of Redondo Beach's housing element. It argues, among other things, that the housing element failed to adequately identify sites that could realistically accommodate "lower income" housing. (§ 65582, subd. (l).) Specifically, it challenges the City's use of a zoning "overlay" that would permit construction of affordable multifamily housing on sites that were otherwise zoned for commercial and industrial use. An overlay zone is "superimposed" over existing zoning to permit or restrict additional uses. (1 Rathkopf's The Law of

---

[1]     All statutory references are to the Government Code, unless otherwise specified.

[2]     The Housing Element Law is codified as Government Code sections 65580 to 65589.11 and found in article 10.6 of chapter 3 of division 1 of title 7 of the Government Code.

[3]     For ease of reference, we refer below to petitioners, collectively, as New Commune, and to respondents, collectively, as the City.

Zoning and Planning (4th ed.) § 1:31, Zoning techniques—
Overlay zones.)

We reverse. An overlay cannot be used to satisfy the
minimum density and residential use requirements set out in
section 65583.2, subdivision (h)(2) (hereafter section
65583.2(h)(2)), where the base zoning expressly permits
development that does not include housing. We also find that the
City has failed to establish that one of the sites identified in the
housing element, the Inglewood Avenue site currently occupied
by a Vons supermarket, was properly identified as a developable
site.

### THE HOUSING ELEMENT LAW

**A.    Goals of Housing Element Law and Regional
Housing Needs Allocation**

California requires local governments to adopt a
"comprehensive, long-term general plan for . . . physical
development[.]" (§ 65300.) Each general plan must have a
housing element. (§ 65302, subd. (c).) A housing element must
identify and analyze existing and projected housing needs,
quantify specific objectives for meeting those needs, and program
for development of needed housing. (§ 65583.) This requires,
among other things, "[a]n assessment of housing needs and an
inventory of resources and constraints that are relevant to the
meeting of these needs." (*Id.*, subd. (a).) It also requires a
program, specifying what actions the local government is
undertaking or intends to undertake to implement the goals and
objectives of the housing element, and on what timeline. (*Id.*,
subd. (c).) Essentially, the housing element is a set of "standards
and plans for housing sites in the municipality that 'shall
endeavor to make adequate provision for the housing needs of all

3

economic segments of the community.' [Citations.]" (*California Building Industry Assn. v. City of San Jose* (2015) 61 Cal.4th 435, 444; see also § 65580 [legislative findings concerning Housing Element Law].)

Local governments must periodically, and as "frequently as appropriate," review and evaluate all of the following aspects of their adopted housing element: "(1) The appropriateness of the housing goals, objectives, and policies in contributing to the attainment of the state housing goal. [¶] (2) The effectiveness of the housing element in attainment of the community's housing goals and objectives. [¶] (3) The progress of the city, county, or city and county in implementation of the housing element. [¶] (4) The effectiveness of the housing element goals, policies, and related actions to meet the community's needs, pursuant to paragraph (7) of subdivision (a) of Section 65583." (§ 65588, subd. (a).)

After this review and evaluation is completed, local governments must revise their housing element "to reflect the results of this periodic review." (§ 65588, subd. (b).) "A revised housing element's assessment of needs must quantify the locality's existing and projected housing needs for all income levels, which includes the locality's proportionate share of regional housing needs for each income level." (*Martinez v. City of Clovis* (2023) 90 Cal.App.5th 193, 223 (*Clovis*), citing § 65583, subd. (a)(1).)

At a minimum this process must occur on a statutorily established timeline for revision. "The interval between the due dates for the revised housing element is referred to as a planning period or cycle, which usually is eight years." (*Clovis,* 90 Cal.App.5th at p. 222, citing § 65588, subds. (e)(3), (f)(1).)

4

For each planning cycle, the Department of Housing and Community Development (HCD) provides local governments, in consultation with regional councils of government and the Department of Finance, a needs assessment. This assessment is referred to as a "regional housing needs allocation" (RHNA) and allocates regional housing need among local governments in the region. (*Clovis, supra*, 90 Cal.App.5th at p. 223, citing § 65584, subd. (b).) A jurisdiction's share of the RHNA is separated into four income levels: very low, low, moderate, and above moderate. (§§ 65583.2, subd. (a), 65584, subd. (f).)

## B.    Housing Inventory Requirements

As noted above, one aspect of the housing element is an inventory. The inventory of land must include "land suitable and available for residential development, including vacant sites and sites having realistic and demonstrated potential for redevelopment during the planning period to meet the locality's housing need for a designated income level . . . ." (§ 65583, subd. (a)(3).) The sites available for residential development include (1) vacant sites zoned for residential use, (2) vacant sites zoned for nonresidential use where residential development is allowed, (3) residentially zoned sites that can be developed at a higher density, and (4) sites zoned for nonresidential use which can be redeveloped and rezoned for residential use. (§ 65583.2, subd. (a)(1)–(4).)

For nonvacant sites in the inventory, the local government must consider "the extent to which existing uses may constitute an impediment to additional residential development" and "an analysis of any existing leases or other contracts that would perpetuate the existing use or prevent redevelopment of the site for additional residential development." (§ 65583.2, subd. (g)(1).)

5

When a local government identifies nonvacant sites to accommodate 50 percent of its share of "lower income" housing, i.e., verylow- and low-income housing, the existing use on any given site "shall be presumed to impede additional residential development, absent findings based on substantial evidence that the use is likely to be discontinued during the planning period." (§ 65583.2, subd. (g)(2).)

## C. Housing Program and Minimum Requirements for Lower Income Housing Sites

After preparing its site inventory, a local government must prepare a program to implement the goals and objectives of its housing element. (§ 65583, subd. (c).) This includes identifying specific actions it will take to make sites with appropriate zoning available. (§ 65583, subd. (c)(1).) The program "shall" accommodate all RHNA-identified need for lower income households. (§ 65583.2, subd. (h)(1).) When the site inventory does not identify adequate sites to accommodate each income level of the RHNA, the local government shall include a program for rezoning the sites in the housing element to "close the gap." (*Clovis*, *supra*, 90 Cal.App.5th at p. 225; § 65583, subd. (c)(1).)

The rezoning program shall identify sites that can be developed for housing that comply with section 65583.2, including subdivision (h) (section 65583.2(h)). (§ 65583, subd. (c)(1)(B).) A rezoning program to address unmet needs for lower income housing shall "permit owner-occupied and rental multifamily residential use by right for developments in which at least 20 percent of the units are affordable to lower income households during the planning period." (§ 65583.2, subd. (h)(1).) " 'Use by right' " means that a local government cannot require a "conditional use permit, planned unit development permit, or

6

other discretionary local government review or approval" to approve the residential use. (§ 65583.2, subd. (i).)

Section 65583.2(h) also requires the sites at issue to be zoned with "minimum density and development standards" of "at least 20 units per acre" in suburban jurisdictions. (§ 65583.2, subds. (c)(3)(B)(iii), (h)(2).)[4] Further, at least 50 percent of the lower income housing is required to be "accommodated on sites designated for residential use and for which nonresidential uses or mixed uses are not permitted." (§ 65583.2(h)(2).) There is an exception to this rule for certain mixed-use sites: subdivision (h)(2) allows a local government to "accommodate all of the lower income housing need on sites designated for mixed use if those sites allow 100 percent residential use and require that residential use occupy 50 percent of the total floor area of a mixed-use project." (*Ibid.*)

## D.     Housing Element Adoption Process and HCD Review

The Housing Element Law requires the planning agency of a local government to submit a draft of its revised housing element, or subsequent amendments, to HCD for its review and written findings. (§ 65585, subd. (b)(1).) If HCD's written findings are timely submitted as required by section 65585, the local government must consider the findings "[p]rior to the adoption of its draft element or draft amendment." (*Id.*, subd. (e).)

---

[4]     After the City adopted the housing element at issue in this appeal, section 65583.2 was amended to break subdivision (h) into two paragraphs. As relevant here, the statutory requirements were not substantively changed. (Compare Stats. 2021, ch. 358, § 2.5, eff. Jan. 1, 2022 with Stats. 2024, ch. 282, § 6.5, eff. Jan. 1, 2025.) For clarity, further citations are to the version of section 65583.2(h) effective January 1, 2025.

In its written findings, HCD is required to determine whether the draft element substantially complies with the Housing Element Law. (§ 65585, subd. (d).) An adopted housing element may be found to be in substantial compliance by either HCD or a court. (§ 65585.03, subd. (a).) If HCD finds substantial compliance, the housing element is subject to a rebuttable presumption of validity. (§ 65589.3, subd. (a).)

If a local government has not adopted a housing element that substantially complies with the Housing Element Law, the local government cannot disapprove affordable housing projects based on inconsistency with a zoning ordinance or the general plan. (§ 65589.5, subd. (d)(1), (2).)

## FACTUAL AND PROCEDURAL BACKGROUND

### I. City Charter Provisions Governing "Major Changes In Allowable Land Use"

Since 1949, City of Redondo Beach has been a charter city. (*Cawdrey v. City of Redondo Beach* (1993) 15 Cal.App.4th 1212, 1217.) "Charter cities are specifically authorized by our state Constitution to govern themselves, free of state legislative intrusion, as to those matters deemed municipal affairs." (*State Building & Construction Trades Council of California v. City of Vista* (2012) 54 Cal.4th 547, 555.) Municipal land use and zoning regulations are municipal affairs. (*Committee of Seven Thousand v. Superior Court* (1988) 45 Cal.3d 491, 511.) The City's Charter is its constitution and supreme law. (See *Woo v. Superior Court* (2000) 83 Cal.App.4th 967, 974; *Domar Electric, Inc. v. City of Los Angeles* (1994) 9 Cal.4th 161, 170.)

In 2008, the City's residents passed Measure DD, which added article XXVII to the Redondo Beach City Charter (hereafter Charter). Under article XXVII, section 27.4, approval

8

by a majority of the City voters is required for each "major change in allowable land use." "Major change in allowable land use" is defined as a proposed amendment of, among other things, the City's general plan or zoning ordinance.

In 2024, the City's residents passed Measure RB, which amended sections relating to "major changes in allowable land use" to clarify that the public vote requirement does not apply to amendments or updates to the housing element. (See Charter, art. XXVII, § 27.6(h) [stating that article "shall not apply to an amendment to or update of the housing element of the City's General Plan"].)

## II.    The City's Sixth Cycle Housing Element Process

For the 2021–2029 planning period (sixth cycle), the City's RHNA was 2,490 units, including 936 very low-income units, 508 low-income units, 490 moderate-income units, and 556 above-moderate income units. The sixth cycle housing element deadline was October 15, 2021.

The City submitted its initial draft housing element update to HCD in July 2021, with several revisions submitted thereafter. After exchanges of written findings from HCD concerning deficiencies and two subsequent amendments to the housing element, the City Council adopted a third amended housing element in July 2022, one month after New Commune filed its verified petition for writ of mandate. The City did not send the third amended housing element to HCD prior to adopting it. Contending it included "no changes in land use designations," the City did not ask its voters for approval. In September 2022, HCD found the third amended housing element to be fully compliant with the Housing Element Law.

9

## III. The City's Residential Overlay Strategy

The City's housing element uses a "residential overlay" to satisfy the RHNA. The overlay here is superimposed over six commercial and industrial districts to accommodate 1,470 residential units. The City's overlay allows for residential use at densities up to 55 dwelling units per acre.

## IV. Key Sites: South Bay Marketplace and Inglewood Avenue

As relevant to this appeal, the City's housing element identifies sites at the South Bay Marketplace and 4001 and 4051 Inglewood Avenue. These sites contain parking lots that service retail tenants at shopping centers.

The South Bay Marketplace site consists of four parcels that make up a "largely underutilized parking lot." The housing element identifies this site as able to support 486 lower-income units and allow the existing parking use to remain. The City's outside expert determined that the housing proposed for the site is physically and financially feasible. As part of its identification and evaluation of the site, the City intended to communicate with the owners of the site regarding redevelopment.

The Inglewood site supports 35 very low-income units and 140 above moderate-income units. The owner of the Inglewood site confirmed in writing to the City that it would welcome high-density residential housing on the site, and that it had experience obtaining entitlements to build similar housing on other properties it owns. Vons grocery store is a tenant on the site. The lease between the property owner and Vons allows Vons, in its "sole and absolute discretion," to withhold consent to changes in the part of the parking area in the contractually defined "Zone of Control." For changes to the part of the parking area outside the

10

Zone of Control, Vons cannot "unreasonably" withhold, delay, or condition consent.

## V.  Procedural History

In June 2022, before the City Council adopted the City's housing element, New Commune filed a petition for writ of mandate and complaint for declaratory relief. New Commune is a property owner in the City seeking to develop housing. After the City's housing element was adopted, New Commune amended its petition and complaint to add allegations about the City's housing element.

The trial court denied the petition and complaint. On February 9, 2024, the court entered judgment for the City. New Commune timely appealed.

## DISCUSSION

As a preliminary matter, except for HCD's correspondence to the City of Yorba Linda presented by the City, which we deem to be irrelevant, we grant the requests for judicial notice from New Commune, the City, and amicus curiae Yes In My Back Yard. (Evid. Code, § 452, subds. (b), (d), (h).)

## I.  Standard of Review

Any interested party may bring an action for traditional mandamus under Code of Civil Procedure section 1085 to ensure a housing element's conformity with the Housing Element Law. (§§ 65583, subd. (h), 65587, subd. (b).)

Both trial and appellate courts review whether the housing element " 'substantially complies' " with the requirements of the Housing Element Law. Substantial compliance means " ' "actual compliance in respect to the substance essential to every reasonable objective of the statute, as distinguished from mere

11

technical imperfections of form." ' " (*Clovis, supra,* 90 Cal.App.5th at p. 237, italics omitted.) Appellate courts independently determine whether the housing element complies with the Housing Element Law without giving any deference to the trial court. (*Fonseca v. City of Gilroy* (2007) 148 Cal.App.4th 1174, 1191.)

Where HCD has determined a housing element or amendment substantially complies with the Housing Element Law, the burden of proof shifts to the party challenging the housing element to demonstrate that the presumption of validity is incorrect. (*Clovis, supra,* 90 Cal.App.5th at p. 243; see § 65589.3, subd. (a) [presumption is rebuttable].)

## II. Measure RB Moots the Charter Voter Approval Challenge

Having established the legal framework for our review, we turn first to New Commune's contention that the City's Sixth Cycle 2021–2029 Draft Housing Element (the City's housing element) is invalid because the City's voters did not approve it under article XXVII, section 27.4 of the Charter. The trial court agreed that the City's housing element constituted a "major change in allowable land use," but determined that the state Housing Element Law preempts the Charter's voter approval requirement.

We do not reach this issue because it is moot. After the appeal was fully briefed, the City's voters approved Measure RB. As a result, the Charter now states that article XXVII, which contains the requirement of voter approval for "major changes in allowable land use," does not apply to amendments to or updates of the housing element of the City's general plan. (Charter, art. XXVII, § 27.6(h).)

12

Because writs of mandate operate prospectively, we apply the law currently in effect. (See *Flores v. Department of Transportation* (2022) 76 Cal.App.5th 678, 681–683 [applying revised statute while appeal was pending to suits for injunctive and writ relief]; *Citizens for Positive Growth & Preservation v. City of Sacramento* (2019) 43 Cal.App.5th 609, 626 [applying current law at time of appellate court judgment in mandamus proceedings].) Based on the amended Charter, amendments or updates to the housing element do not require voter approval.

## III. The City's Residential Overlay Zone Violates the Housing Element Law

New Commune argues that the City's accommodation of RHNA through a residential overlay fails to comply with the Housing Element Law. After examining the overlay at issue and the statutory framework, we conclude that the City's residential overlay violates the Housing Element Law for two independent reasons. First, the overlay fails to satisfy section 65583.2(h)(2)'s mandatory minimum density requirement of 20 units per acre because the underlying commercial and industrial zoning permits development of identified sites within the overlay zone that does not include housing, i.e., that permits construction with zero residential units. Second, the overlay violates section 65583.2(h)(2)'s requirement that at least 50 percent of lower-income housing sites be "designated for residential use and for which nonresidential uses or mixed uses are not permitted" because it preserves underlying commercial and industrial uses and fails to satisfy the mixed-use exception. We address each reason in turn, then explain why HCD's approval cannot override these clear statutory violations.

13

### A. Section 65583.2(h)'s Minimum Density Requirements Are Mandatory

The Fifth District's decision in *Clovis* represents the first and only published appellate analysis of section 65583.2(h)'s minimum density requirements. The *Clovis* court determined that "section 65583.2(h) clearly imposes a minimum density requirement when a jurisdiction is required to rezone sites to accommodate a shortfall for the current planning period . . . ." (*Clovis*, *supra*, 90 Cal.App.5th at p. 244.) It rejected an overlay superimposed on a residential zone that would have permitted development below 20 units per acre. (*Id*. at p. 238.)

The parties devote significant space in their briefs to discussing the merits of *Clovis*, with the City arguing that it was incorrectly decided or distinguishable. Although it relies on the mixed-use exception specifically, discussed in greater detail *post*, the City argues generally that section 65583.2(h) allows an overlay that merely permits, as opposed to requires, development of at least 20 units per acre for sites identified to fulfill the unmet need for lower income housing. We agree with *Clovis* that section 65583.2(h) is unambiguous and imposes a mandatory minimum density requirement.

Statutory interpretation begins with a review of the statute's words, which are construed using their "usual and ordinary meanings" and "in context." (*Wells v. One2One Learning Foundation* (2006) 39 Cal.4th 1164, 1190.) The statute's plain language governs when the words are unambiguous and do not reasonably permit any other construction. (*Ibid*.)

Section 65583.2, subdivision (h)(1), sets forth the requirements for a rezoning program when the inventory of available sites does not accommodate 100 percent of the

14

identified need for lower income housing. Section 65583.2, subdivision (h)(1) provides that sites accommodating the unmet need "shall be zoned to permit owner-occupied and rental multifamily residential use by right in which at least 20 percent of the units are affordable to lower income households . . . ." (§ 65583.2, subd. (h)(1).) Read alone, this subdivision could support an argument that an overlay complies with the Housing Element Law if it merely *permits* development of at least 20 units per acre. But this section must be read in conjunction with section 65583.2(h)(2), which provides that "[t]hese sites shall be zoned with the minimum density and development standards" and "shall be at least 20 units per acre" in suburban jurisdictions like the City.

A housing overlay that allows development below the "minimum" density requirements is inconsistent with the plain language of section 65583.2(h)(2). "Minimum" means the least acceptable quantity possible. (See Black's Law Dict. (12th ed. 2024) [defining "minimum" as "[o]f, relating to, or constituting the smallest acceptable or possible quantity in a given case"]; Merriam-Webster, at https://www.merriam-webster.com/dictionary/minimum [defining "minimum" as "the least quantity assignable, admissible, or possible"].) Courts consistently interpret a statutory "minimum" as a floor below which something cannot go. (See *Shuts v. Covenant Holdco LLC* (2012) 208 Cal.App.4th 609, 620–621; *Armenta v. Osmose, Inc.* (2005) 135 Cal.App.4th 314, 321, 324; *Morse v. Industrial Accident Commission* (1951) 108 Cal.App.2d 355, 356.)

The City argues, though, that section 65583.2 cannot be interpreted as requiring a mandatory minimum density of 20 dwelling units per acre on all sites because subdivision (h)(2)

15

allows 50 percent of RHNA to be accommodated on sites that permit other uses. It also argues mixed-use sites "cannot be designated only for mixed-use projects" because section 65583.2(h)(2) "mandates that projects with 100 percent residential be allowed" under the mixed-use exception.

Section 65583.2(h)(2) provides two mutually exclusive options for site designation, neither of which is severable from the mandatory minimum density requirements. Under the default requirement, "[a]t least 50 percent of the lower income housing need shall be accommodated on sites designated for residential use and for which nonresidential uses or mixed uses are not permitted." (§ 65583.2(h)(2).) Alternatively, the mixed-use exception permits jurisdictions to "accommodate all of the lower income housing need on sites designated for mixed use" if those sites "allow 100 percent residential use and require that residential use occupy 50 percent of the total floor area of a mixed-use project." (*Ibid.*)

Although the phrase "sites designated for mixed use" is not explicitly defined in the Housing Element Law, the parameters of the phrase are inherent in the language of section 65583.2(h) itself. "Mixed use" sites for purpose of the exception are those that meet the minimum density requirements in subdivisions (h)(1) ("at least 20 percent of the units are affordable to lower income households") and (h)(2) ("sites shall be zoned with minimum density . . . at least 20 units per acre") and are zoned per subdivision (h)(2) to accommodate projects that may contain both residential and nonresidential construction, provided that residential use occupies no less than 50 percent, and up to 100 percent, of total floor area. The fact that residential construction may comprise 100 percent of total floor area on a "sites

16

designated for mixed use" does not suggest municipalities are required or encouraged to zone sites with inconsistent use designations.

"Sites designated for mixed use" are those that meet minimum requirements to qualify under this exception, and not those tied to a specific zoning regulation or use designation as might appear in a local zoning ordinance. Generally, allowable land "uses" and their geographic distribution are prescribed in local zoning ordinances that must conform to the adopted general plan in each municipality, including charter cities. (*Neighborhood Action Group v. County of Calaveras* (1984) 156 Cal.App.3d 1176, 1183; § 65860.) Nothing in the statute suggests the Legislature intended the Housing Element Law to require or permit a municipality to effect land use changes potentially in conflict with local zoning ordinances without engaging in the processes such rezoning typically requires. We therefore disagree with the City's argument that subdivision (h)(2) requires or encourages multiple inconsistent "uses" in a single zone.[5]

---

[5] Given the uniformity requirements in the Planning and Zoning Law, it would be difficult to read section 65583.2(h)(2) as encouraging multiple inconsistent uses, as a matter of right, in a single zone. Although not applicable to charter cities absent local adoption of a uniform use requirement (§ 65803), section 65852 generally precludes the type of inconsistent land uses in a single zone that the City is proposing to create with its overlay. Section 65852, however, is inapplicable to the City, and the parties have not addressed whether the City's Municipal Code or any zoning ordinance permits inconsistent uses. For that reason, and because we find the overlay at issue inconsistent with the Housing Element Law, we do not reach the issue of whether the overlay is inconsistent with any local law governing inconsistent

17

To the extent that the language of section 65583.2(h)(2) is ambiguous, we interpret the statute with an eye toward effectuating its purpose and may look to legislative history and public policy. (*Prang v. Los Angeles County Assessment Appeals Bd.* (2024) 15 Cal.5th 1152, 1170.) The stated purpose of the Housing Element Law and related legislative history also suggest that the minimum density standards are a mandatory minimum floor for site identification.

In enacting the Housing Element Law, the Legislature prioritized the expansion of housing opportunities and the attainment of housing for Californians of all economic levels. (§ 65580, subds. (a), (b).) It found that providing affordable housing "requires the cooperation of all levels of government." (*Id.*, subd. (c).) It also determined that local and state governments have a duty to "facilitate the improvement and development of housing to make adequate provision for the housing needs of all economic segments of the community." (*Id.*, subd. (d).)

To further these goals, the Legislature enacted the Housing Element Law expressly to assure that local governments "will prepare and implement housing elements which . . . will move toward attainment of the state housing goal." (§ 65581, subd. (b).) The Housing Element Law "shall be construed consistent with, and in promotion of, the statewide goal of a sufficient supply of decent housing to meet the needs of all Californians." (§ 65589, subd. (d).)

Before 2017, the Housing Element Law allowed cities to adopt housing elements without considering the realistic

---

uses, or, whether as a general matter, the form of overlay used here runs afoul of section 65852.

development potential of identified sites. At that time, section 65583.2, subdivision (c), required local governments to determine whether the sites identified in the housing element could accommodate some portion of their RHNA. Section 65583.2, subdivision (c), did not address whether development would realistically occur. Local governments were able to "circumvent" their obligation to accommodate affordable housing by "relying on sites that aren't truly available or feasible for residential development, especially multifamily development." (Assem. Com. on Housing and Community Development, Analysis of Assem. Bill No. 1397 (2017–2018 Reg. Sess.) Apr. 17, 2017.)

This prompted the Legislature to enact Assembly Bill No. 1397 (AB 1397) in 2017. This legislation amended section 65583.2, subdivision (c), to require local governments to "determine whether each site in the inventory can accommodate *the development of* some portion of its share of the regional housing need by income level during the planning period . . . ." (Stats. 2017, ch. 375, § 4, p. 91, italics added [adding "the development of" to § 65583.2, subd. (c)].) Since the enactment of AB 1397, housing element inventories must state the number of units that can "realistically be accommodated" at each site and whether the site "is adequate to accommodate lower-income housing, moderate-income housing, or above moderate-income housing." (Stats. 2017, ch. 375, § 4, p. 91; compare § 65583.2, subd. (c).)

AB 1397 codified the goal of the Housing Element Law, which was not merely to require identification of sites that could theoretically accommodate housing need, but to encourage development to meet housing needs. (See Elmendorf et al., *Making It Work: Legal Foundations for Administrative Reform of*

19

*California's Housing Framework* (2020) 47 Ecology L.Q. 973, 992, 1030, fn. 308.)

Overlays that allow for development below the prescribed density conflict with the Housing Element Law as modified by AB 1397. AB 1397 was not the only legislative change designed to clarify the Legislature's intent that housing laws expand realistic development opportunities or affordable lower income housing. Assembly Bill No. 1690 (AB 1690), enacted in 2014, also attempted to address this problem relative to the mixed-use exception.

The purpose of AB 1690 was to allow local jurisdictions to identify mixed-use sites to meet RHNA allocations for lower income housing when existing sites were inadequate. (Assem. Floor Analysis, 3d reading analysis of Assem. Bill No. 1690 (2013–2014 Reg. Sess.) May 14, 2014.) An early draft of the legislation provided, "At least 50% of the very low- and low-income housing need shall be accommodated on sites designated for residential use or mixed-uses." (Assem. Bill No. 1690 (2013–2014 Reg. Sess.) as introduced Feb. 13, 2014.)

Subsequent analysis of the bill identified a concern that "mixed-use zones . . . do not necessarily require mixed uses or the inclusion of housing on the site," which could result in "commercial development occupying all or large portions of sites needed for affordable housing." (Sen. Transportation and Housing Com., Analysis of Assem. Bill No. 1690 (2013–2014 Reg. Sess.) June 24, 2014.) One suggestion to address this concern was to "consider amending the bill to allow a city or county to accommodate all of its very low- and low-income housing need on sites designated for mixed uses only if those sites allow 100%

residential use and require at least 50% residential floor area."
(*Ibid.*, bold omitted.) The Senate amended the bill as suggested.

Subsequent analysis in the Assembly also noted that lack of a requirement for sites in mixed-use zones to include housing "could result in commercial development occupying all or large portions of sites needed for affordable housing." (Assem. Floor Analysis, Concurrence in Senate Amendments (2013–2014 Reg. Sess.) Aug. 21, 2014.) Further, the Floor Analysis of the Senate's alterations to the bill stated: "As the rezoning program only applies if a local government fails to identify adequate sites to accommodate its RHNA share, it is especially important to encourage the actual development of affordable housing in these localities. With this in mind, the Senate amendments narrow the bill's original mixed-use zoning provision by only permitting mixed-use sites that allow 100% residential use and require at least 50% residential floor area." (*Ibid*.)

This history evidences the Legislature's intent to prevent local jurisdictions from including in their housing element sites that have little to no probability of being used to meet identified housing needs. Subdivision (h)(2) must be construed in this context to the extent it is ambiguous. (§ 65589, subd. (d).) This undercuts the City's argument that there is no requirement to compel residential use on mixed-use project sites.

### B. *The City's Overlay Does Not Comply With Section 65583.2(h)*

As explained above, section 65583.2(h)(2) provides two mutually exclusive options for site designation, the default option and mixed-use option, neither of which is severable from the mandatory minimum density requirements. The City's overlay does not comply with any of these requirements.

21

### 1. The overlay allows development with zero residential units

The housing element at issue accommodates 1,223 lower-income residential units through a residential overlay applied to sites zoned for commercial and industrial use. The overlay allows for a density of 55 dwelling units per acre. The overlay does not eliminate the commercial and industrial base zoning on the identified sites. The City's housing element provides: "The residential overlay will allow either the underlying use, the residential use at a gross calculation of density, or both as a mixed use site." The question presented here is whether the existing base zoning renders the overlay unlawful under section 65583.2.

New Commune argues that the overlay subverts the purpose of the Housing Element Law by allowing the housing element to identify sites that accommodate RHNA but that, in actuality, may be developed without any residential component. For this reason, New Commune argues that the housing element fails to satisfy the applicable density requirement under section 65583.2, subdivision (c)(3)(B)(iii) ["at least 20 units per acre"].

We agree with New Commune. *Clovis* held that overlays are unlawful when they allow development below the statutory minimum density. The City argues that *Clovis* was incorrectly decided or distinguishable because, unlike the overlay here, the overlay in *Clovis* was superimposed over residential base zoning. The City also emphasizes that the overlay here "is applied to existing older industrial and commercial uses that are ripe for redevelopment." These distinctions are insignificant. The *Clovis* court found that "section 65583.2(h) clearly imposes a minimum density requirement when a jurisdiction is required to rezone

sites to accommodate a shortfall for the current planning period . . . ." (*Clovis, supra*, 90 Cal.App.5th at p. 244.) This is consistent with our interpretation of section 65583.2(h).

The City's overlay is inconsistent with the mandatory minimum density requirements because it allows development on identified sites without requiring any residential construction, i.e., it allows for construction with zero residential units.

### 2. The overlay does not comply with the default requirements or mixed-use exception in section 65583.2(h)(2)

In addition to the minimum density standard at issue in *Clovis*, section 65583.2(h)(2) separately requires that at least 50 percent of lower income housing sites be "designated for residential use and for which nonresidential uses or mixed uses are not permitted." The exception to this requirement is that a city may accommodate all its lower income housing need on mixed-use sites.

The City's overlay fails because it cannot satisfy any of these requirements.

Section 65583.2(h)(2) establishes that "At least 50 percent of the lower income housing need shall be accommodated on sites designated for residential use and for which nonresidential uses or mixed uses are *not permitted* . . . ." (Italics added.) The phrase "not permitted" constitutes an absolute prohibition. "Not permitted" means forbidden, prohibited, or eliminated entirely. (See Black's Law Dict. (12th ed. 2024) [defining "not permitted" as "forbidden by law or regulation"].)

The City's overlay preserves underlying commercial and industrial zoning that expressly permits nonresidential uses including retail, office, manufacturing, and warehousing. Because

23

the statute requires that certain uses be proscribed, i.e., "not permitted," an overlay that preserves those uses does not comply with subdivision (h)(2). The City cannot simultaneously permit and prohibit a particular use on a single site. Because the City's overlay maintains commercial and industrial zoning rights that section 65583.2(h)(2) requires be eliminated, the overlay fails as a matter of law.

Likewise, the City's overlay cannot qualify for the mixed-use exception. By preserving the underlying commercial and industrial zoning, thereby allowing future development without any residential component, the overlay fails to meet the requirement that residential use occupy no less than 50 percent, and up to 100 percent, of total floor area of projects on the designated sites.

These are independent bases for invalidating the City's housing element, separate from the minimum density violations discussed above.

### 3. Statutory violations cannot be cured by HCD approval

The City contends that we should defer to HCD, the agency that enforces the Housing Element Law. According to the City, HCD's guidance concerning overlay zoning further supports the presumption of validity arising from HCD's approval of the City's housing element pursuant to section 65589.3. HCD's "Housing Element Site Inventory Guidebook" refers explicitly to the use of overlays to support lower income housing.

Courts "accord significant weight and respect to the long-standing construction of a law by the agency charged with its enforcement." (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1082, overruled on other grounds in *In re Lawrence* (2008) 44 Cal.4th

1181, 1191.) But courts "remain the final arbiters of statutory meaning." (*Center for Biological Diversity, Inc. v. Public Utilities Com.* (2025) 18 Cal.5th 293, 303.) While HCD has specific statutory authority under section 65583, subdivision (a), to develop definitions, standards, and forms for housing elements, this authority does not extend to rewriting statutory requirements. Even when an agency has enhanced statutory authority, courts independently interpret clear legislative mandates rather than defer to agency interpretations that conflict with plain statutory language. (*Riddick v. City of Malibu* (2024) 99 Cal.App.5th 956, 968.)

As we have discussed at length above, there is nothing ambiguous about the word "minimum" in section 65583.2(h)(2). It is not clear that HCD's guidelines conflict with this reading merely because they provide that overlay zones may be used to "ensure maximum allowable densities can be achieved." For example, HCD's guidance also provides that development standards, such as height limits and required commercial use on ground floors in mixed-use projects, must still "allow for the density allowed under the overlay." But to the extent that HCD's guidance conflicts with the minimum density requirements articulated in the statute, it is not entitled to deference.

Section 65583.2(h)(2) also clearly declares that nonresidential uses are "not permitted," except to the extent the mixed-use exception applies. The overlay here permits nonresidential uses on sites designated to accommodate more than 50 percent of the unmet lower income housing need, without also meeting the mixed-use exception requirements, in contravention of section 65583.2(h)(2). To the extent HCD's guidelines support this type of overlay, they are contrary to law

and not entitled to deference. HCD's approval of the housing element here does not cure the myriad defects we have identified.

That is, although there is a rebuttable presumption here that the City's housing element is valid (§ 65589.3), New Commune has met its burden to show that the element is unlawful.

We recognize the City expended significant time and energy preparing the housing element and responding to HCD findings. We also recognize the potential practical problems inherent in rezoning. But the Legislature has established minimum density requirements and cabined the discretion of local jurisdictions to prevent them from overriding those requirements. We decline the invitation to reconsider the wisdom or practicality of this approach.

For these reasons, we find that the City's housing element does not substantially comply with the Housing Element Law. New Commune is entitled to a writ of mandate directing the City to develop a housing element that complies with section 65583.2(h)(2).

## IV. Identified Nonvacant Sites

Having determined that the overlay zone fails to comply with statutory requirements, we turn to New Commune's challenge to individual identified sites. At least one of the identified nonvacant sites was not properly identified as a developable site.

### A. Legal Standard for Nonvacant Sites

Housing elements must contain an "inventory of land suitable and available for residential development, including vacant sites and sites having realistic and demonstrated potential for redevelopment during the planning period to meet

the locality's housing need for a designated income level . . . ." (§ 65583, subd. (a)(3).) HCD's guidelines define "vacant site" as "a site without any houses, offices, buildings, or other significant improvements on it." Development of the land or the addition of permanent structures on the property constitute improvements.

In identifying sites, cities must consider "the extent to which existing uses may constitute an impediment to additional residential development" and "any existing leases or other contracts that would perpetuate the existing use or prevent redevelopment of the site for additional residential development." (§ 65583.2, subd. (g)(1).) When a city uses nonvacant sites to satisfy more than 50 percent of the lower income housing need, cities must "demonstrate that the existing use . . . does not constitute an impediment to additional residential development during the period covered by the housing element." (*Id.*, subd. (g)(2).) An existing use is presumed to impede additional residential development, "absent findings based on substantial evidence that the use is likely to be discontinued during the planning period." (*Ibid.*) Substantial evidence is reasonable, relevant, and credible evidence of solid value which "a reasonable mind might accept as adequate to support a conclusion." (*California Youth Authority v. State Personnel Bd.* (2002) 104 Cal.App.4th 575, 584–585.)

It is undisputed that the City claims to accommodate more than 50 percent of the lower income housing need using nonvacant sites. The City has an RHNA obligation of 936 very low-income units and 508 low-income units for a total of 1,444 lower income housing units. The City has approved 50 units at vacant sites and projects the construction of 144 accessory dwelling units for a total of 194 vacant sites. The City seeks to

accommodate the remaining allocation—more than half of the lower income housing need— using nonvacant sites. New Commune specifically challenges the identified sites at South Bay Marketplace and 4001/4051 Inglewood Avenue.[6]

### B. *Identification of South Bay Marketplace Is Supported By Substantial Evidence*

According to the City's housing element, the overlay at South Bay Marketplace consists of four parcels of land comprising a parking lot. The parking lot currently serves retail tenants at the marketplace. The City contends that the site can accommodate a total of 486 lower income housing units.

New Commune faults the City for not having confirmed with the property owners that the site is free from any lease requirements and that the property owners would agree to the development of housing on their properties. In support of these assertions, New Commune refers to the City housing element's statement that the City "will engage" with its economic development agency to "facilitate direct and targeted communications with property owners" concerning redevelopment.

---

[6] Petitioners do not specifically address other sites, instead contending that "numerous" other sites suffer from "similar issues." The appellant bears the burden of demonstrating the error in the trial court judgment. (*Hernandez v. California Hospital Medical Center* (2000) 78 Cal.App.4th 498, 502.) Because petitioners do not present any argument or citation to the record concerning other nonvacant sites, they have waived any challenge to those sites. (*Employers Mutual Casualty Co. v. Philadelphia Indemnity Ins. Co.* (2008) 169 Cal.App.4th 340, 351–352.)

The City's housing element states that the site is a "largely underutilized parking lot" for the South Bay Marketplace which "does not support other off-site uses." The City's housing element also states that residential development on the site would not require displacement of existing uses because the parcels composing the site are separate from parcels with existing structures.

Further, the City retained an expert who assessed the feasibility of developing 486 units of very low-income housing on the site. The expert determined that even incorporating existing parking requirements into the construction, the development is physically feasible. The expert also determined that the proposed development is financially feasible with common sources of funding for affordable housing projects, including tax credits, grants, and loans. While the City has not confirmed the property owners' willingness to allow development on the site, the expert reviewed affordable housing projects in nearby cities and opined that such projects "routinely support land values per acre" which are "sufficient to induce development" of the proposed housing.

Based on the current underutilization of the site, as well as the physical and financial feasibility found by the expert, the City presents substantial evidence that the existing parking on the site will be discontinued and not impede the development of lower income housing. Because HCD determined the City's housing element was valid, there is a presumption of validity that New Commune bears the burden to rebut. (See *West Washington Properties, LLC v. Department of Transportation* (2012) 210 Cal.App.4th 1136, 1144; *Clovis*, *supra*, 90 Cal.App.5th at p. 243.) New Commune has not demonstrated that development of lower income housing on the site is physically or

29

financially infeasible. Accordingly, we cannot find that the City's identification of the South Bay Marketplace site to accommodate lower income housing was invalid.

## C. Identification of Inglewood Avenue Sites Is Not Supported By Substantial Evidence

The City's housing element also includes 4001 and 4051 Inglewood Avenue, which are currently leased by, among other retail establishments, a Vons grocery store. The City claims that the sites have the potential to accommodate 35 very low-income units and 140 above moderate-income units. In support of this claim, the City refers to a letter from the property owner indicating that it would welcome development of high-density residential housing on the site. The property owner also provided examples of other properties where it has incorporated residential housing into commercial property.

New Commune, however, demonstrates that limitations on the site impede the development of housing. According to the lease between the property owner and Vons, the "Common Area" includes the parking areas within the "Zone of Control." The lease restricts the landlord from changing the Common Area without Vons's written consent; Vons has "sole and absolute discretion" to withhold consent. In other words, Vons has the absolute right to veto the development of housing on the site.

The City contends that another portion of the lease provides that Vons cannot "unreasonably" withhold, delay, or condition its consent. While true, the provision pertains to the Common Area outside the Zone of Control. The plan of the site indicates that at least half of the parking area is in the Zone of Control.

The City otherwise presents no evidence that Vons would consent to the development of housing in the Zone of Control, or that the land outside the Zone of Control could accommodate the number of units claimed by the City in its housing element. The City has not presented substantial evidence that Vons will discontinue its existing use on the Inglewood Avenue site or that this use will not impede the development of housing. This failure also supports reversal on appeal.

## V. Issues Not Addressed On Appeal

Having determined that the housing element must be revised to address the violations identified above, we do not reach the issue of whether the City could lawfully adopt its housing element before HCD determined the draft plan substantially complied with the Housing Element Law. We also note that after judgment was entered in the trial court, the Legislature enacted Assembly Bill No. 1886, which added section 65585.03 to the Government Code. This statute dictates when a housing element, or amendment to a housing element, is in substantial compliance with the Housing Element Law. These procedural issues are preserved for consideration below should they be relevant to further review of any amended or revised housing element.

We also do not reach amicus curiae's argument that the City's housing element does not affirmatively further fair housing, as required by sections 65583, subdivision (c)(1) and 8899.50, subdivision (a)(1). Because this issue was first raised by amicus curiae and not raised by New Commune, we decline to address it. (C*alifornia Building Industry Assn. v. State Water Resources Control Bd.* (2018) 4 Cal.5th 1032, 1048, fn. 12.)

31

## DISPOSITION

The judgment is reversed. On remand, the trial court is directed to vacate its order denying New Commune's petition and to issue in its place a writ of mandate compelling the City to revise its Sixth Cycle 2021–2029 Draft Housing Element consistent with this opinion. New Commune is entitled to recover its costs on appeal.

## CERTIFIED FOR PUBLICATION

KLATCHKO, J.*

We concur:

EGERTON, Acting P. J.

ADAMS, J.

---

* Judge of the Riverside County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.